J-S63017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.D.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M. H., GRANDMOTHER | : : : : : : : | |
| | : | No. 1302 EDA 2019 |

Appeal from the Order Entered April 24, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000693-2016

BEFORE:   GANTMAN, P.J.E., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MURRAY, J.:                **FILED DECEMBER 31, 2019**

M.H. (Maternal Grandmother) appeals from the order denying her petition to adopt her minor granddaughter, S.D.R. (born September 2012) (Child), pursuant to the Adoption Act, 23 Pa.C.S. §§ 2101–2910.  After careful review, we affirm.

We adopt the following statement of the history of the matter, summarized from the trial court opinion and the record.  **See** Trial Court Opinion, 8/29/19, at 1-5.  Child was born in September 2012 to K.R. (Mother).  **See** N.T., 4/10/19, at 12.  Until November 30, 2014, Child resided in Atlanta, Georgia, with Mother.  **Id.**  On that date, Maternal Grandmother, upon learning that Mother had been arrested on retail theft charges, transported

---

[*] Retired Senior Judge assigned to the Superior Court.

Child to Philadelphia. *Id.* at 12-13. Maternal Grandmother also had custody of Child's brother, S.R., born October 2006. *Id.* at 13.

On December 3, 2014, the Philadelphia Department of Human Services (DHS) received a general protective services (GPS) report alleging that Mother had left Child alone in a motel room with two other minor children after being arrested for theft. *Id.* at 13-14. The report further averred that Maternal Grandmother had retrieved Child from Georgia and brought her to Philadelphia. *Id.* During a subsequent investigation, DHS caseworker Jennifer Sewell learned that Mother had reported Child missing and kidnapped. *Id.* at 13-14.

On January 9, 2015, DHS removed Child from Maternal Grandmother's custody and placed her in foster care. *Id.* A shelter care hearing was held January 13, 2015, and supervised visitation was ordered for Mother and Maternal Grandmother. *Id.* at 14-15. DHS filed a dependency petition as to Child, and Child was adjudicated dependent on January 22, 2015. *Id.* at 15. During Child's commitment, Maternal Grandmother attended supervised visitation weekly from February 2015 through September 2016. *Id.* at 15-16. Maternal Grandmother attended forty-one visits with Child. *Id.* at 16. Child's brother accompanied Maternal Grandmother to fifteen visits. *Id.* at 16-17.

In August 2015, Child was removed from her foster home due to reports of physical abuse by her foster parent and placed in a respite foster home. *Id.* at 17. In February 2016, Child was removed from her respite foster home

after her foster mother was unable to continue caring for her. *Id.* Child was removed from her third foster home in October 2017 after her foster mother lost her housing and foster family members who were caring for her refused to provide the Community Umbrella Agency (CUA) with information to run criminal and Childline clearances. *Id.* at 17-18. Again, Child was placed in a respite foster home. *Id.* at 18. In February 2018, Child was removed from that foster home after her foster mother became ill, and was placed with M.A. (Foster Mother). *Id.*

Throughout the pendency of this case, the trial court held permanency review hearings. During the August 4, 2016 hearing, Turning Points for Children CUA manager James Wirt testified that CUA completed a family profile in August 2015. *Id.* at 19. Maternal Grandmother was identified as an interested relative, but ruled out as a permanency resource. *Id.* at 19.

On August 4, 2016, DHS filed a petition seeking to involuntarily terminate Mother's parental rights. On September 8, 2016, Mother's parental rights were terminated.[1]

With regard to Child's living situation, in addition to Child, Foster Mother's three biological children and another foster child reside in the home. *Id.* at 11-14. Shortly after Child's placement, Foster Mother agreed to be an adoptive resource for Child, and A Second Chance, Inc., recommended that Foster Mother be approved as an adoptive parent. *Id.* at 17-18. In October

---

[1] Mother appealed the termination, and this Court affirmed. *See In Interest of S.D.R.*, 179 A.3d 580 (Pa. Super. 2017) (unpublished memorandum).

2018, DHS approved Foster Mother as an adoptive resource and consented to Child's adoption by Foster Mother. *Id.* at 18-19.

Child, who is seven years old, has special needs. *Id.* at 19-20. She has been diagnosed with developmental delays. *Id.* Child receives speech therapy and special instruction through Elywn Seeds. *Id.* at 19. Child was enrolled in kindergarten in the Philadelphia School District in 2018-2019, and struggles academically. *Id.* at 20. She cannot remember her birthday, the alphabet and numbers, and cannot spell or write her name. *Id.* Foster Mother is Child's educational decision maker and requested an individualized education plan (IEP) for Child. *Id.* As a result, Child is in a blended educational program with placement in a partial life skills classroom with learning support in all core subjects, as well as speech and language therapy. *Id.* at 21. Child also was referred for mental health services. *Id.* Additionally, Child suffers from severe asthma and requires an inhaler up to three times a day, as well as oral medication. *Id.*

Maternal Grandmother resides in Philadelphia, in a two-story, three-bedroom home with Child's brother. *Id.* at 19. The home is well furnished, clean, and appropriate for Child. *Id.*

On December 2, 2016, Maternal Grandmother filed a petition seeking to adopt Child. Foster Mother filed a petition seeking to adopt Child on November 9, 2018. The court convened a hearing on the petitions on April 10, 2019. Child was represented by Marni Gangel, Esquire, as legal counsel and guardian *ad litem*. Maternal Grandmother, who is hearing impaired, testified on her

own behalf with the assistance of an American Sign Language (ASL) interpreter. Attorney Gangel presented the testimony of Jennifer Sewell, DHS investigative worker, and Dawn Potalivo, Turning Points for Children case manager. Foster Mother testified on her own behalf and presented the testimony of Angela Cordova, a social worker who completed the family profile for Foster Mother.

At the conclusion of testimony, the court held the matter under advisement. On April 24, 2019, the court granted Foster Mother's adoption petition and denied Maternal Grandmother's petition.

On April 29, 2019, Maternal Grandmother *pro se* filed a timely notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[2] Maternal Grandmother's counsel filed an amended notice of appeal and statement of errors complained of on appeal on her behalf on May 19, 2019.

Maternal Grandmother raises the following issues:

> 1[.] The trial court erred and/or abused its discretion by entering an order on April 24, 2019[,] denying the Adoption [Petition] filed by [Maternal] Grandmother, M.H. More specifically, the trial court abused its discretion as substantial, sufficient, and credible

---

[2] While hybrid representation is generally not permitted on appeal, this Court is required to docket a *pro se* notice of appeal "even in instances where the *pro se* appellant was represented by counsel in the trial court." **Commonwealth v. Williams**, 151 A.3d 621, 623 (Pa. Super. 2016) (emphasis and internal brackets omitted) (citation omitted). Maternal Grandmother's counsel has submitted all subsequent filings.

evidence was presented at the time of trial which would have substantiated granting the Petition for Adoption.

2[.] The trial court erred and/or abused its discretion by denying the Adoption [Petition] filed by [Maternal] Grandmother, M.H., where [Maternal] Grandmother presented evidence showing that it was in the best interest of [C]hild to be adopted by [Maternal Grandmother,] who has custody of [Child's] brother.

Maternal Grandmother's Brief at 7.[3]

We initially note that Maternal Grandmother cites no legal authority, either statutory or case law, to support her arguments. Accordingly, she risks waiver. *See*, *e.g.*, *Thomas v. Thomas*, 194 A.3d 220, 229 (Pa. Super. 2018) (noting that appellant must support each issue raised by discussion and analysis of pertinent authority; failure to do so hampers this Court's review and risks waiver). Even if Maternal Grandmother did not waive her arguments, however, we would find them to be meritless.

With regard to adoption, we review the trial court's determinations for an abuse of discretion. *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). This Court has stated:

[a]n abuse of discretion does not exist merely because a reviewing court would have reached a different conclusion. Appellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

---

[3] Maternal Grandmother also argues that Child should never have been removed from her custody without Maternal Grandmother being allowed to present evidence on her behalf; however, Maternal Grandmother did not appeal the January 22, 2015 adjudication of dependency, and cannot challenge the adjudication in this appeal.

*Id.* While we are not bound by findings of fact unsupported by the record or the court's inferences drawn from the facts, we defer to the findings of the trial judge with regard to credibility and weight of the evidence. *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996)

In adoption matters, the paramount concern is the best interests of the child. *K.D.*, 144 A.3d at 151. "This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *A.S.H.*, 674 A.2d at 700 (citations omitted); *see also* 23 Pa.C.S. § 2902(a). Once parental rights have been terminated:

> anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided. Furthermore, a trial court must base its conclusions in an adoption case upon all relevant information discerned with the full participation of all interested parties.

*In re Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa. Super. 1996).

We address Maternal Grandmother's two issues together because they are interrelated. Maternal Grandmother argues that the court erred when it denied her petition because there was substantial, sufficient, and credible evidence presented to support her assertion that it was in Child's best interests to be adopted by Maternal Grandmother. *See* Maternal Grandmother's Brief at 12. Maternal Grandmother emphasizes that Child had lived with Maternal Grandmother and Child's brother; that notes from their visits show a strong and loving parental bond between Maternal Grandmother and Child; and that Child should never have been removed from Maternal Grandmother's custody.

*Id.* at 12-13. Further, Maternal Grandmother argues that the accusations of her kidnapping Child were "made up"; that her home was evaluated and found to be appropriate; that she has sufficient income to care for Child; that her trial testimony was credible; and it is in Child's best interest to be adopted by Maternal Grandmother. *Id.* at 14.

The record does not support Maternal Grandmother's claims. We begin with the testimony of DHS caseworker Jennifer Sewell, who testified that she was the initial investigative worker assigned in December 2014 following the receipt of a GPS report. *See* N.T., 4/10/19, at 112. Maternal Grandmother had contacted DHS for assistance in getting Child a birth certificate, social security card, and enrolling her in daycare. *Id.* at 113. Ms. Sewell met with Maternal Grandmother and conducted a home assessment. *Id.* At that time, Maternal Grandmother informed Ms. Sewell that Mother had been arrested and Maternal Grandmother traveled to Georgia to get Child. *Id.* at 113-114.

After the interview, Mother contacted Ms. Sewell and relayed that she wanted her daughter back; that she had not permitted Maternal Grandmother to take Child; and she had reported to the police that Child had been kidnapped. *Id.* at 114-115. Additionally, Mother informed Ms. Sewell that as a child, Mother had been abused and placed in foster care, and she did not have a good relationship with Maternal Grandmother. While DHS had initially intended to put Child in kinship placement with Maternal Grandmother, the plan was changed to reunification with Mother. *Id.* at 116. In response, Maternal Grandmother became extremely upset. *Id.* at 117-118. Ms. Sewell

discovered Maternal Grandmother had filed for custody of Child, rather than waiting to go through the proper process relating to kinship care. *Id.*

Dawn Potalivo testified that she is the case management director at Turning Points for Children CUA. *Id.* at 121-122. She is familiar with Child and became involved with the family in January 2018, when a case involving Child's brother, S.R., alleging medical neglect, was opened. *Id.* at 121-22. CUA conducted a home visit with Maternal Grandmother; ultimately, S.R.'s case was closed. *Id.* at 124-25. At that time, CUA was seeking a permanent placement for Child. *Id.* at 124-26. Child had initially been placed with Foster Mother in February 2018 as a respite home. *Id.* at 125-26. However, Foster Mother expressed a desire to adopt Child because Child had quickly assimilated to the home and bonded with Foster Mother. *Id.*

In November 2018, following a court order granting Maternal Grandmother supervised visitation, CUA, despite concerns, set up visits with Child and Maternal Grandmother. *Id.* at 126-127. Maternal Grandmother continually referred to Child returning to her home, despite the order excluding Maternal Grandmother as a placement resource. *Id.* at 127. Maternal Grandmother arrived at CUA offices on at least two occasions very upset and frustrated. *Id.* at 127-28. Maternal Grandmother raised her voice, threw small objects to emphasize her points, and on one occasion, had to be escorted out by security. *Id.* at 128.

Maternal Grandmother required an ASL interpreter, but CUA was not always able to provide one because Maternal Grandmother would arrive at the

office unannounced. *Id.* at 128-129. Following a court order, CUA employees, through an interpreter, attempted to talk to Maternal Grandmother about planning ahead and confirming her visits before she arrived. *Id.* at 129-130. Additionally, CUA employees attempted to impress on Maternal Grandmother the importance of not discussing court matters in front of Child. *Id.* at 130. Maternal Grandmother eventually agreed to the terms of the court order, but remained frustrated by the rules and by Foster Mother, who Maternal Grandmother claimed did not love Child. *Id.* at 130.

Diamond Johnson, a case aide, and Lauren Pointer, a supervisor, supervised the visits. *Id.* at 132. Initially, CUA had only one staff member supervising visits, but after another incident, where Maternal Grandmother alleged that Child was being abused, two staff members began supervising. *Id.* at 132-133.

Ms. Potalivo described an additional visit during which Child became hysterical and was crying that she wanted to go home to her mommy, meaning Foster Mother. *Id.* at 134. Child had begun crying after Maternal Grandmother attempted to help her with homework and criticized Child's crayons. *Id.* at 134-35. Ms. Potalivo tried to calm Child so she could continue the visit, but Child insisted she wanted to go home. *Id.* at 135. Ms. Potalivo told Maternal Grandmother that Child was feeling a little sad and would like to go home and see her "mommy," referring to Foster Mother. *Id.* at 135-36. Maternal Grandmother said, "That's not her mommy. This is my time." *Id.* at 136. Ms. Potalivo responded that Child had come to say goodbye and they

could discuss these concerns later, but not in front of Child. *Id.* at 136. Maternal Grandmother became very upset, packed her belongings, and stated to Child, "Bye, [Child,]" before walking out of the room. *Id.* at 136. Child was shocked, and after Maternal Grandmother left, said, "Grandmom's mad. Grandmom's mad at me." *Id.* at 137.

Ms. Potalivo was involved in the weekly visits because staff either came to get her because Child was upset; Child was not able to be soothed; or security was called because of raised voices. *Id.* at 137. Often, Child would cry and ask for Foster Mother when brought to Ms. Potalivo's office. *Id.* at 137-138.

Since beginning visits, Maternal Grandmother made several DHS reports, the first alleging that Child was not dressed appropriately and was suffering mistreatment in her foster home. *Id.* at 139. DHS did not accept this report for investigation. *Id.* at 140. Maternal Grandmother made two additional complaints that Foster Mother was inappropriately disciplining Child and another boy in the home by physically abusing them. *Id.* at 141-42. The report alleged that the information came from Child at a supervised visit, but, because staff were in the room the entire time, they reported Child had never made those statements. *Id.* at 142. CUA workers called the DHS hotline to provide supplementary information about what was and was not discussed at the visit. *Id.*

DHS considered removing Child from the home. *Id.* However, after investigation, DHS found that the children in Foster Mother's home reported

no abuse, were not fearful, and were happy residing there. *Id.* at 142-43. Foster Mother was a loving and attentive parent and there was no concern as to her disciplinary practices. *Id.* at 143. Child was well-taken care of and bonded to Foster Mother. *Id.* at 143. There was one visit where Child had healing scratches on her arm, but reported they had come from a new family cat. *Id.* at 144. Foster Mother also agreed that the Child had been scratched by a cat. *Id.* Ms. Potalivo testified that after the reports of abuse, staff were very concerned that Child might be removed from the home and that it would be "devastating" to Child to be placed with a stranger rather than Foster Mother. *Id.* at 145.

Up to the day before the April 2019 adoption hearing, there were issues with Maternal Grandmother's visits. *Id.* About an hour after the April 9, 2019 visit began, security came to get Ms. Potalivo, who found Child in the fetal position on the floor sobbing. *Id.* When asked what happened, Maternal Grandmother responded, "That woman is brainwashing her." *Id.* at 146. When Ms. Potalivo attempted to take Child out of the room because she was crying, Maternal Grandmother denied that Child was crying and attempted to pull Child out of the fetal position despite Child's resistance. *Id.*

After Child was removed from the room, Maternal Grandmother stated that Child had an odor and Maternal Grandmother suspected there was fecal matter on Child's behind and that she was not wiped properly. *Id.* at 147. Maternal Grandmother wanted staff to take Child to the bathroom and wipe her, or allow Maternal Grandmother to wipe her. *Id.* Ms. Potalivo responded

that the issue should be addressed, but that it was not appropriate for staff or Maternal Grandmother to unclothe a six-year-old to wipe her. *Id.* Ms. Potalivo, who did not notice an odor about Child, offered to give Child flushable wet wipes to clean herself. *Id.*

Maternal Grandmother stated she was also upset that Child was being brainwashed and there must be something wrong with Child because she was crying all the time. *Id.* at 147-48. Ms. Potalivo explained that when Child is upset, she wants to go home to be comforted by Foster Mother, and that this is a difficult time for Child, who is tense because Maternal Grandmother speaks negatively about Foster Mother. *Id.* at 148. Maternal Grandmother denied that this was a problem, and repeated that Foster Mother was not Child's mother. *Id.*

When Child did not wish to go to the bathroom, Ms. Potalivo offered her two pieces of candy as encouragement. *Id.* at 149. When Child was finished in the bathroom, Ms. Potalivo, again, did not smell an odor. *Id.* Child was given the candy, and Ms. Potalivo returned to her office. *Id.* Within fifteen minutes, however, Ms. Potalivo heard Child crying again. *Id.* at 149-50. Case aides supervising the visit informed Ms. Potalivo that as Child was leaving, Maternal Grandmother took her candy and would not give it back until Child told Maternal Grandmother she loved her. *Id.* at 150. Child would not answer at first, and eventually said, "Bye, Grandmom" but would not say[,] "I love you." *Id.* Maternal Grandmother kept the candy. *Id.*

Ms. Potalivo opined that the visits with Maternal Grandmother and Child were not in Child's best interest. *Id.* at 151. Child was very stable in Foster Mother's home. *Id.* Since visiting with Maternal Grandmother, staff noticed such a change in Child that they made a referral for individual therapy for Child. *Id.* Staff unsuccessfully attempted to help Maternal Grandmother and show her how to redirect Child. *Id.* Maternal Grandmother criticized staff for their interventions and believed they were trying to sabotage her visits by telling Child "no." *Id.* at 152.

Ms. Potalivo additionally opined that it is in Child's best interest to be adopted by Foster Mother. *Id.* at 152-53. Child is very bonded to Foster Mother, wishes to remain with her, and considers Foster Mother to be her mother. *Id.* at 153. Child is bonded to the other children in the home and considers them her siblings. *Id.* at 153. Child picked out a new name for herself for when she is adopted. *Id.* It would be detrimental to Child to be removed from the home. *Id.*

Angela Cordova, a social worker and independent contractor for Second Chance, testified that she completed the family profile. *Id.* at 155-56. She first became involved in 2016, when Child was transitioning from another resource family to Foster Mother's home. *Id.* at 156-57. Child adjusted very quickly in Foster Mother's home. *Id.* at 157. Foster Mother was dedicated to Child's care and quickly got Child current on medical and dental care. *Id.* After being placed with Foster Mother, Child became more outgoing, and was excited to live with other children her age. *Id.* at 157-58. Child quickly began

calling Foster Mother "mommy" and the other children in the home her siblings. *Id.* at 158.

Ms. Cordova testified that Child would like to stay with Foster Mother. *Id.* at 159. She described the affectionate bond between Child and Foster Mother as a loving, warm, mother-daughter relationship. *Id.* at 159. While Child does not fully understand the concept of adoption, Child indicated that she would like to remain with Foster Mother, and had chosen Foster Mother's surname to use after adoption. *Id.* at 160. Ms. Cordova believed that removal from Foster Mother's home would be devastating to Child. *Id.* at 161.

Foster Mother testified that she works in housekeeping at a local hotel. *Id.* at 163. When Foster Mother is working, children are either at after-care or with Foster Mother's sister. *Id.* at 164. Foster Mother is the mother of three biological children and a foster son. *Id.* at 163-65. She described Child as outgoing, silly, and "a little diva"; she further stated that they bonded so quickly it was like Child was always hers. *Id.* at 163. Foster Mother described Child's demeanor after visits with Maternal Grandmother, noting that while Child normally sleeps in her own bed, she usually asks to sleep with Foster Mother after visits. *Id.* at 164. Child seems worried she is going to have to leave Foster Mother and wants to be comforted by only her. *Id.* at 164-65. Foster Mother's oldest son is autistic and she was used to providing educational support for him, and believed she could do the same for Child. *Id.* at 168-69. Previously, she had fostered children and maintained good relationships with them and their birth families. *Id.* at 165-69.

Finally, Foster Mother testified that she would be devastated if Child were removed from the home, and believed that removal would hurt Child as well, due to their strong bond. *Id.* at 167. Foster Mother described herself as "a little old lady in a shoe," because she only worked and took care of her kids. *Id.*

Maternal Grandmother testified that she lives in Philadelphia with S.R., who has been in her care since his birth. *Id.* at 31. Maternal Grandmother stated that she previously had temporary custody of Child in Oklahoma City, Oklahoma, before Child was reunited with Mother. *Id.* at 33. Maternal Grandmother testified that in late 2014, she was contacted through Facebook by someone who averred that Child and two other children were left in a hotel room alone in Georgia, and went to a nearby restaurant with Mother's phone to seek help. *Id.* at 34-35. Maternal Grandmother claimed that she did not know where Mother was at the time, because Mother had been arrested, and Maternal Grandmother agreed to go to Georgia to get Child. *Id.* at 35-36. She then contacted DHS in Philadelphia to let them know Child was in her care. *Id.* at 36. A DHS representative came to her house to evaluate the home and found it appropriate. *Id.* at 36-37. Maternal Grandmother testified that S.R. also has special needs, and when the school district would not offer him an IEP, she retained a lawyer to get S.R. an IEP and additional assistance. *Id.* at 66-68.

Maternal Grandmother admitted that Child had been removed from her care due to allegations of kidnapping. *Id.* at 40-42. Maternal Grandmother

also admitted that Mother had previously been in foster care and a group home. *Id.* at 26, 42. At some point in her childhood, Mother accused her older brother of having molested her, beginning when she was six years old. *Id.* at 75-76. Mother, who was fourteen when she gave birth to S.R., was deemed unsafe around the baby. *Id.* at 26, 42-43. Additionally, Maternal Grandmother testified that she had lived in five different homes since moving to Philadelphia, including a shelter, and that previously she had lived in Oklahoma, New York, and North Carolina. *Id.* at 50-52, 62-64, 85-87. She also denied being subject to eviction proceedings, despite the fact that one of her landlords had filed a suit against her. *Id.* at 71-72, 87.

Maternal Grandmother testified that she is very close to Child, and that she loves Child and Child loves her. *Id.* at 32. However, Maternal Grandmother alleged that Child had been "brainwashed" and that "they" kept pushing Child and making her say things she did not want to say. *Id.* Maternal Grandmother admitted she had never met Foster Mother, but claimed that Diamond Johnson, the case aide who supervised some of the visits, had tried to separate Child from Maternal Grandmother. *Id.* at 53-54. Maternal Grandmother had previously made allegations that Foster Mother was not providing Child with clothes that fit properly; not feeding Child properly; that Child had scratches and bruises on her arm; and that Foster Mother was abusing Child emotionally and physically. *Id.* at 96-100. Maternal Grandmother claimed Child had disclosed this abuse during a supervised visit. *Id.* at 100-101.

After hearing this evidence, the trial court concluded:

> This court, in assessing what is in the best interest of [Child], in the instant contested adoption, is called upon to choose the more appropriate party. The trial court gives great weight to [Foster Mother's] petition as she has been involved in the day to day parenting of [Child] and has provided her continuous care. The court, in making its best interest analysis, must also consider bonding . . . Courts must consider the effect upon children of removing them from a known physical environment . . . it would be destructive and certainly not in the best interest of [Child] to remove her from the family unit created by [Foster Mother] and given the interwoven parent-child and sibling relationships that have developed and flourished. This familial dynamic has become integral to [Child's] welfare and personal growth.

Trial Court Opinion, 8/29/19, at 8-9 (citations omitted).

The trial court found the testimony of Ms. Sewell, Ms. Potalivo, and Ms. Cordova credible, reliable, and professionally competent. *Id.* at 4. The trial court found Foster Mother's testimony very credible. *Id.* Conversely, the trial court found Maternal Grandmother's testimony to be evasive, non-responsive, inaccurate, and lacking in full candor, *i.e.*, not credible. *Id.* As noted above, we defer to the trial court's findings of credibility and weight accorded to the evidence. *A.S.H.*, 674 A.2d at 700.

In light of the foregoing, we discern no error in the trial court's conclusions. The evidence does not support Maternal Grandmother's contention that it is in Child's best interest to be adopted by Maternal Grandmother. As noted, *supra*, the paramount concern in adoption cases is the best interests of the child, which is a determination made on a case-by-

case basis, with consideration of a child's physical, intellectual, moral, and spiritual well-being. *A.S.H.*, 674 A.2d at 700.

Here, the evidence showed that Maternal Grandmother attended most visits with Child and consistently expressed an interest in adopting her. She testified that she loves Child and that Child should be in a home with her biological relatives, including Child's half-brother, S.R. However, the testimony reflects that Maternal Grandmother is not suited to parent Child. The record reflects that Maternal Grandmother is unable to place Child's welfare and best interests above her own frustrations and emotions. On the other hand, Child has benefitted from a loving, stable placement with Foster Mother. Child is thriving in Foster Mother's home and has expressed a desire to remain with her. Accordingly, the record reflects that it is in Child's best interest to be adopted by Foster Mother, such that the trial court did not err in denying Maternal Grandmother's adoption petition, and granting the adoption petition of Foster Mother.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/19

- 19 -